**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JODIE M. MAXWELL,**

             **Plaintiff,**

    **v.**                            **Civil Action 2:17-cv-835**
                                        **Judge Algenon L. Marbley**
                                        **Magistrate Judge Jolson**

**COMMISIONER OF**
**SOCIAL SECURITY,**

             **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Jodie M. Maxwell, brings this action under 42 U.S.C. § 405(g) and 1383(c) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 8) be **OVERRULED**, and that judgment be entered in favor of Defendant.

## I.    BACKGROUND

Plaintiff filed her applications for DIB and SSI on September 26, 2013, alleging disability beginning on October 13, 2009. (Tr. 17, PAGEID #: 57). She later amended her onset date to March 6, 2014. (Tr. 272, PAGEID #: 315). The date last insured was December 31, 2015. (Tr. 18, PAGEID #: 58). Administrative Law Judge Thomas L. Wang (the "ALJ") held a hearing on January 28, 2016. (Tr. 36–44, PAGEID #: 76–84). Plaintiff did not appear. (*Id.*). Plaintiff showed good cause for not appearing, and a second hearing was held on May 11, 2016. (Tr. 17, 45–62, PAGEID #: 57; 85–102). On June 16, 2016, the ALJ issued a decision denying Plaintiff's applications for benefits. (Tr. 17–28, PAGEID #: 57–68). The Appeals Council

denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–7, PAGEID #: 41–47).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on September 22, 2017. (Doc. 1). Plaintiff filed her Statement of Errors on March 26, 2018 (Doc. 8), Defendant filed an Opposition (Doc. 9), and no reply was filed.

## A. Relevant Hearing Testimony

### 1. *January 28, 2016 Hearing*

Plaintiff did not appear at her initial hearing due to transportation issues, but her attorney was present. (Tr. 38–39, PAGEID #: 78–79). At the hearing, the ALJ asked Plaintiff's counsel if there were any documents or exhibits that were still outstanding, to which counsel replied "[t]he record's complete, Your Honor." (Tr. 39, PAGEID #: 79).

### 2. *May 11, 2016 Hearing*

Plaintiff was present and represented by the counsel for the second hearing. (Tr. 47, PAGEID #: 87). The ALJ began Plaintiff's second hearing as follows:

ALJ: Any additional documents to present today?
Atty: No, Your Honor.
ALJ: And the record [is] complete?
Atty: Yes.

(*Id.*).

At that hearing, Plaintiff's counsel clarified that Plaintiff's alleged onset date was amended from October 2009 to March 6, 2014. (Tr. 48, PAGEID #: 88). Plaintiff testified that, even after March 6, 2014, she worked part time at Golden Corral and Funk's Ice Cream, but was fired due to behavioral issues. (Tr. 49, PAGEID #: 89). More specifically, Plaintiff stated that at Golden Corral she "got really angry with the manager and [] threw a pan at him[,]" and, at Funk's, she started crying at work and was subsequently let go. (*Id.*).

Plaintiff testified that her mental health issues cause her inability to work; she has no physical issues that prevent her from working. (Tr. 50, PAGEID #: 90). When asked by the ALJ why Plaintiff believes she is unable to work, she testified that "there's days that I don't even want to get out of bed and there's days that I'm just angry at people and I just don't want to be around nobody." (*Id.*). Plaintiff's counsel later asked what her biggest problem was regarding work, and she responded "[b]eing around people." (Tr. 56, PAGEID #: 96). Plaintiff later explained that she doesn't "like when people come at [her] in an angry way because then [she]'ll flip out on them." (Tr. 52, PAGEID #: 92).

Plaintiff also testified that she experiences significant stress and worries daily. (Tr. 51, PAGEID #: 91). When asked what induces her stress, she responded "[i]t's just that I really don't like people." (Tr. 53, PAGEID #: 93). Plaintiff further testified that she has mood swings "every other day, maybe every day." (Tr. 55, PAGEID #: 95). Although Plaintiff takes medications for her mental health, she testified they do not help. (Tr. 51, PAGEID #: 91). Plaintiff stated her therapy "helps a little bit but not as much as it should." (*Id.*). Plaintiff testified that she used illegal drugs previously, but had not used cocaine in years and indicated she had been clean from drugs "for about going on four years now." (*Id.*).

At the time of the hearing, Plaintiff lived with her mom and stepdad and testified as to her relationship with them:

Q: How's your relationship with them?
A: I hate my stepdad. I wish I could kill him.
Q: Okay. Do you get into altercations with him?
A: Yeah. We just did yesterday.
Q: What – how about your mom?
A: I get a tude [sic] with her sometimes, but not like I do with him.
Q: Okay. What sort of things make you mad that she does?
A: She tells me – just basically they get on my – I don't know what to say.

(Tr. 54, PAGEID #: 94). Plaintiff also explained that she was single because she used to physically abuse her ex-girlfriend: "I just—she would argue with me and then I'd just get mad and hit her." (*Id.*). Plaintiff testified that she was previously incarcerated for domestic violence. (Tr. 54–55, PAGEID #: 94–95).

In terms of daily activities, Plaintiff testified that she tries to help her mom out around the house, but she doesn't have the motivation. (Tr. 55, PAGEID #: 95). Plaintiff stated that she hates going to stores because she "hate[s] being around other people." (*Id.*).

**B. Relevant Medical Evidence**

On June 4, 2012, Plaintiff was hospitalized "for suicidal ideation with a plan to overdose or hang herself with a belt in a closet." (Tr. 396, PAGEID #: 441). Plaintiff was described at the hospital, however, as alert, cooperative, calm, pleasant, and in no distress. (Tr. 397, PAGEID #: 442). It was also noted that Plaintiff's mood was depressed, affect constricted, and speech was soft. (*Id.*). Plaintiff admitted to illegal drug use at the time, and marijuana was present in her lab results. (Tr. 397–98, PAGEID #: 442–43). Plaintiff was discharged on June 6, 2012, and reported that she was "doing well" and that her depression was improving. (Tr. 399, PAGEID #: 444).

Plaintiff was seen at Family Care Behavioral Health by Dr. George Moses and Mr. Tim Ickes, PA-C (Physician's Assistant) numerous times between December 2012 and January 2016. (*See generally* Doc. 7-7). During her visits, Plaintiff's chief complaints varied between anxiety, depression, fatigue, and irritability. (*See, e.g.*, Tr. 343, 344, 347, 560, PAGEID #: 388, 389, 392, 605). Plaintiff was described consistently as alert and easily engaged, having good eye contact, her appearance was noted as neat and clean, and her speech and thoughts were fully within normal limits. (*See, e.g.*, Tr. 341, 343, 344, 347, 558–62, PAGEID #: 386, 388, 389, 392, 603–

07).

On August 14, 2013, Plaintiff presented for attention deficit hyperactivity ("ADHD") testing. (Tr. 342, PAGEID #: 387). The test results were reported "equivocal" for ADHD, and Mr. Ickes noted that her results "make [him] question if she really tried on the test" and whether she was "pressing the button randomly." (*Id.*). Ultimately, Mr. Ickes opined that, based on the test results, it was possible that Plaintiff had a frontal brain dysfunction, so he cautioned the use of stimulants. (*Id.*). At the same time, however, he explained that "the prolonged disengaged response of this patient renders the test virtually invalid." (*Id.*). At a follow-up appointment a few weeks later, Plaintiff complained of being depressed and having lost her daughter to children services due to finding "meth and THC in [her] system." (Tr. 341, PAGEID #: 386). Plaintiff reportedly told children's services she would commit suicide if she didn't get her daughter back, and they advised her to apply for disability. (*Id.*). At another appointment on December 20, 2013, Plaintiff complained of depression and reported taking Xanax during an alcoholic blackout. (Tr. 561, PAGEID #: 606).

Following an evaluation of Plaintiff on March 6, 2014, consultative examiner Dr. Floyd Sours completed a Disability Assessment Report. (Tr. 543, PAGEID #: 588). At the appointment, Plaintiff stated that she had been drug-free for nine months, but explained that she lost custody of her daughter. (*Id.*). Dr. Sours described Plaintiff as neat, clean, dressed appropriately, serious, sullen, marginally cooperative, negative, but communicative when spoken to. (Tr. 544, PAGEID #: 589). Plaintiff "was oriented in all four spheres and seemed relevant, coherent and alert throughout the interview." (Tr. 545, PAGEID #: 590). Dr. Sours stated that Plaintiff exhibited a minimal range of emotion and admitted "to some depression" and estimated being anxious "a lot" in the last two weeks. (*Id.*).

Dr. Sours ultimately diagnosed Plaintiff with unspecified bipolar and related disorder, generalized anxiety disorder, substance-related disorder, and specific learning disorder with impairment in reading. (Tr. 546, PAGEID #: 591). Dr. Sours opined that Plaintiff would have limitations in understanding, remembering, and carrying out instructions; her ability to attend and concentrate; her ability to maintain appropriate behavior in a work setting as she relates to supervisors and co-workers; and her ability to maintain appropriate behavior under work pressure in a work setting. (Tr. 546–47, PAGEID #: 591–92). Dr. Sours recommended that Plaintiff not be allowed to manage any potential awarded benefits. (Tr. 547, PAGEID #: 592).

At an August 1, 2014 appointment with Mr. Ickes, Plaintiff reported being down and irritable at times, although she stated that she has better days when she is able to see her daughter. (Tr. 573, PAGEID #: 618). Mr. Ickes noted that Plaintiff appeared anxious and distracted, but was well oriented to person, place, and time; her intelligence estimate was average; her memory was noted to be mildly impaired; and her "vocabulary average" was within normal limits. (*Id.*). At appointments on September 5, 2014 and October 17, 2014, Plaintiff's mood was reported as bad/mad and "drug seeking behavior [was] noted." (Tr. 575, 577, PAGEID #: 620, 622). Mr. Ickes also noted during the October appointment that Plaintiff "appear[ed] vaguely sedated." (Tr. 577, PAGEID #: 622).

On December 1, 2014, Plaintiff was admitted to Appalachian Behavioral Healthcare. (Tr. 563, PAGEID #: 608). Although she was incarcerated at the time in Muskingum County jail for domestic violence charges, she was brought to the facility "due to her increasing depression and suicidal ideation and homicidal ideation towards her cellmate." (*Id.*). Plaintiff stated she felt like hanging herself and smothering her cellmate, but denied any past suicide attempts. (Tr. 563–64, PAGEID #: 608–09). Plaintiff reported that she had been increasingly depressed since

her incarceration. (Tr. 563, PAGEID #: 608). An evaluation revealed that she was oriented to person, place, time, and situation; she had no memory impairment; she appeared in the average to mildly below average range of intelligence; and it was noted that she "is apparently not intellectually disabled." (Tr. 565, PAGEID #: 610). Treatment notes also state that Plaintiff gradually became less demanding, less depressed, less irritable, and she felt that the medication she was taking "was quite helpful." (*Id.*). Plaintiff was discharged on December 10, 2014, her prognosis was listed as "fair to good," and she was described as "clearly stable upon her discharge." (Tr. 563, 566, PAGEID #: 608, 611).

On January 22, 2015, Melinda Lutz, MSW, LISW completed a Mental Impairment Questionnaire for Plaintiff. (Tr. 592, PAGEID #: 637). Ms. Lutz stated that she typically sees Plaintiff every one to two weeks, and she has seen Plaintiff since September 2012.[1] (*Id.*). Ms. Lutz opined that Plaintiff has difficulty maintaining a consistent schedule/routine due to sleep disturbances and relationship issues; she becomes very easily overwhelmed and often responds with both verbal and physical anger; she is easily upset by criticism; and she does not get along well with others. (Tr. 594, PAGEID #: 639). In terms of mental abilities and aptitude, Ms. Lutz checked that Plaintiff had "no useful ability to function" when it comes to maintaining regular attendance and punctuality; completing a normal workday and workweek without interruptions from psychologically based symptoms; accepting instructions and responding appropriately to criticism from supervisors; and dealing with normal work stress. (*Id.*). Ms. Lutz also found Plaintiff was unable to meet competitive standards in the following categories: maintaining attention for two hour segments; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; getting

---

[1] Despite Ms. Lutz's representation that she has seen Plaintiff since September 2012, the record only includes treatment notes from January 2015 until December 2015.

along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a work setting; set realistic goals or make plans independently of others; dealing with the stress of semiskilled and skilled work; interacting appropriately with the general public; and maintaining socially appropriate behavior. (Tr. 594–95, PAGEID #: 639–40). Despite these limitations, Ms. Lutz opined that Plaintiff does not have a low IQ or reduced intellectual functioning. (Tr. 595, PAGEID #: 640).

As for functional limitations, Ms. Lutz opined that Plaintiff had moderate restriction in activities of daily living and marked difficulties in maintaining social functioning and concentration, persistence, or pace. (Tr. 596, PAGEID #: 641). Finally, Ms. Lutz opined that Plaintiff would be absent more than four days per month but could manage benefits in her own best interest. (Tr. 597, PAGEID #: 642).

As mentioned above, the administrative record contains treatment notes from Ms. Lutz from January 2015 through December 2015. (Tr. 680–700, PAGEID #: 725–45). During those appointments, Plaintiffs appearance, behavior, mood/affect, and cognitions were consistently noted as within normal limits. (Tr. 680–81, 683–86, 688, 691–92, 694, 698–700, PAGEID #: 725–726,728–31, 733, 736–37, 739, 743–45). Plaintiff was also frequently described as being pleasant (*e.g.*, Tr. 680, 681, 684, 686, 688, 691, 692, PAGEID #: 725, 726, 729, 731, 733, 736, 737), calm (*e.g.*, Tr. 681, 684, 685, 686, PAGEID #: 726, 729, 730, 731), cooperative (e.g., Tr. 683, 685, PAGEID #: 728, 730), clean in appearance (*e.g.*, Tr. 680, PAGEID #: 725), having clear speech (*e.g.*, Tr. 680, 688, PAGEID #: 725, 733), having logical thoughts (*e.g.*, Tr. 680, 681, 688, PAGEID #: 725, 726, 733), alert and oriented with good short and long term memory (*e.g.*, Tr. 680, 681, 688, PAGEID #: 725, 726, 733), and able to laugh and smile appropriately (*e.g.*, Tr. 680, 681, 684, 685, 686, 688, 691, PAGEID #: 725, 726, 729, 730, 731, 733, 736).

Treatment notes also state things such as "she has a very positive outlook" (Tr. 680, PAGEID #: 725); "[s]he smiles, laughs and jokes throughout the visit" (Tr. 692, PAGEID #: 737); "[s]he appears depressed at the beginning of the visit but is smiling, laughing and joking per usual by the end" (Tr. 699, PAGEID #: 744); and "she participates well and is cooperative" (Tr. 700, PAGEID #: 745).

Ms. Lutz also consistently noted Plaintiff's drug use and the fact that they frequently discussed the consequences of her drug use during counseling sessions. (Tr. 680, PAGEID #: 725 (discussed the importance of "staying away from alcohol"); Tr. 681, PAGEID #: 726 (Plaintiff "admits to a 1½ week bender, using heroin and crack"); Tr. 683, PAGEID #: 728 (discussed consequences of drug use after Plaintiff admitted to heroin use since last appointment); Tr. 684, PAGEID #: 729 (discussed decision-making after Plaintiff admitted to heroin use the day prior); Tr. 686, PAGEID #: 731 (discussed consequences of drug use after Plaintiff admitted to using crack five days prior); Tr. 692, PAGEID #: 737 (denied recent heroin use but admitted to marijuana use); Tr. 694, PAGEID #: 739 (admitted to continued drug use but denied that it is a problem); Tr. 696, PAGEID #: 741 (stated she is using drugs but has not used for five days)).

At a March 2015 appointment with Mr. Ickes, Plaintiff reported that "she [was] doing marginally better" but "still has some mood swings." (Tr. 670, PAGEID #: 715). Mr. Ickes noted that Plaintiff appeared well oriented to person, place, and time, had a mildly agitated demeanor (but less so than at her last visit), drug-seeking behavior was again noted, fund of knowledge was within normal limits for current events, recent events, and distant past, insight and judgment was impaired but only mildly, and her intelligence estimate was average. (*Id.*). At appointments over the next few months, Plaintiff reported that her medications were helping.

(Tr. 672–73, PAGEID #: 717–18).

Plaintiff, however, was again hospitalized on August 31, 2015, for suicidal ideation after getting into a verbal altercation with her neighbor. (Tr. 642–43, PAGEID #: 687–88). Plaintiff reported stressors of not being able to see her daughter and not being able to live with her girlfriend due to previous domestic violence charges. (Tr. 665–66, PAGEID #: 710–11). Her lab results at the time were positive for opioids. (Tr. 644, PAGEID #: 689). Her mental status exam showed she was cooperative, her eye contact was good, she was alert to time, place, and person, she had a constricted affect, and her attention and concentration were intact. (Tr. 646, PAGEID #: 691).

At an appointment with Mr. Ickes in October 2015, Plaintiff stated "that things are better in some respects and no better in others." (Tr. 677, PAGEID #: 722). Specifically, she reported that her anger and anxiety are better, but she was having trouble with her memory. (*Id.*). Consistent with most of her evaluations with Mr. Ickes, Plaintiff was reported as being well-oriented to person, place, and time, her thought processes appeared grossly intact, she was only mildly impaired as to insight and judgment and her intelligence estimate was average. (*Id.*).

**C. State Agency Assessments,**

On March 25, 2015, state agency psychologist Katherine Fernandez Psy.D., opined that Plaintiff was not significantly limited in her ability to understand, remember, and carry out very short and simple instructions; to remember location and work-like procedures; to sustain an ordinary routine without special supervision; or to make simple work-related decisions. (Tr. 90–91, PAGEID #: 131–32). Dr. Fernandez did, however, opine that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for an extended period of time; and work in coordination with or in

proximity to others without being distracted. (*Id.*). More specifically, Dr. Fernandez stated that the evidence indicated Plaintiff could maintain attention and concentration, but she may have difficulty when exposed to large crowds or stressful environments. (Tr. 91, PAGEID #: 132). Further, Dr. Fernandez found Plaintiff would do best in a work setting that required simple and repetitive duties, only brief interaction with others, no interactions with the public, and did not include strict production quotas and changes could be adjusted over time. (Tr. 91–92, PAGEID #: 132–33). State agency psychologist Karen Steiger, Ph.D., made identical findings at the reconsideration level on May 29, 2015. (Tr. 125–27, PAGEID #: 166–68).

**D. ALJ's Decision**

The ALJ found that Plaintiff had not engaged in substantial gainful activity since March 6, 2014, the alleged onset date. (Tr. 20, PAGEID #: 60). The ALJ also determined that Plaintiff suffered from the following severe impairments: a mood disorder NOS, an anxiety disorder NOS, a bipolar II disorder, a learning disorder in reading, attention deficit hyperactivity disorder ("ADHD"), polysubstance abuse in remission, obesity, plantar fasciitis of the left foot, and bilateral hip arthritis. (*Id.*). The ALJ opined, however, that none of the impairments alone or in combination met or equaled a listed impairment. (*Id.*). Specifically, the ALJ found that Plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of Listing 12.04 or 12.06. (Tr. 21, PAGEID #: 61). Indeed, the ALJ found that Plaintiff had only moderate restrictions in activities of daily living, moderate difficulties with regard to concentration, persistence, or pace, marked difficulties in social functioning, and no episodes of decompensation which were of extended duration. (Tr. 21–22, PAGEID #: 61–62).

As to the residual functional capacity ("RFC"), the ALJ determined Plaintiff could:

[p]erform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except her ability to push and pull is limited as per her exertional weight limits. She can

work in environments with only occasional exposure to loud noise as defined by SCO code 4. She can perform goal-based production where the work is measured by end result, not pace work. She can perform simple, routine, repetitive tasks where she can be off task up to five percent of the workday. She is limited to low stress jobs defined as jobs requiring only occasional changes in the work setting. She can perform work that requires only occasional interaction with coworkers and supervisors and no interaction with the public.

(Tr. 22–23, PAGEID #: 62–63).

In terms of the weight given to various opinions, the ALJ assigned Dr. Sours's opinion great weight "because it was consistent with the treatment notes and mental status examinations of record through the relevant period, which document mild to moderate symptoms and limitations overall." (Tr. 26, PAGEID #: 66). Great weight was also given to the state agency psychological consultants' assessments because they were "consistent with and supported by the record as a whole, including the physical examinations and mental status examinations throughout the relevant period." (*Id.*). Finally, the ALJ assigned Ms. Lutz's opinion little weight:

> The claimant's therapist opined that the claimant has no useful ability to function in the areas of maintaining regular attendance and punctuality, to complete a normal workday or workweek without interruption from psychologically based symptoms, to accept criticism or instructions, or deal with normal work stress. (Ex. B10F/3). She also endorsed inability to meet competitive standards in areas including maintaining attention for two-hour segments, sustaining an ordinary routine without special supervision, or to get along with coworker without exhibiting behavior extremes. (*Id.*). The undersigned gave this opinion little weight because the extreme limitations the therapist endorsed are not consistent with her treatment records at Exhibit B13F/1, 2, 4, 5, 7, 13, 15, 17, 20, in which she indicated that the claimant presented with logical thoughts, cooperative, pleasant, smiling behavior. The therapist noted that the claimant was "laughing and joking per usual," was "calm," and exhibited a "very positive outlook" (*Id.*). The mental status examinations and treatment records document mild to moderate symptoms overall and do not support the limitations noted in this assessment.

(*Id.*).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III.     DISCUSSION

Plaintiff asserts three assignments of error:  (1) the ALJ erred by failing to consider whether Plaintiff's impairments met or equaled Listing 12.05; (2) the RFC is not supported by substantial evidence; and (3) the ALJ committed reversible error in according "little weight" to the opinion of Plaintiff's mental health therapist.  (*See* Doc. 8).  Each error will be addressed in turn.

### A.  Listing 12.05

Plaintiff contends that the ALJ erroneously failed to consider or discuss Plaintiff's mental impairments as they relate to Listing 12.05.  (Doc. 8 at 6).  At the time of the ALJ's decision, Listing 12.05, which defines intellectual disability, provided:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the

developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (effective May 24, 2016 to Sept. 28, 2016). Plaintiff's

argument involves the requirements in Paragraph C:

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. § Pt. 404, Subpt. P, App. 1. In other words, a claimant must make three showings to

satisfy Listing 12.05(C): "(1) she experiences 'significantly subaverage general intellectual

functioning with deficits in adaptive functioning [that] initially manifested during the

developmental period' (i.e., the diagnostic description); (2) she has a 'valid verbal, performance,

or full scale IQ of 60 through 70'; and (3) she suffers from 'a physical or other mental

impairment imposing an additional and significant work-related limitation of function.'" *West v.*

*Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 697 (6th Cir. 2007) (quoting 20 C.F.R. Pt. 404,

Subpt. P, App. 1, § 12.05(C); citing *Foster v. Halter*, 279 F.3d 348, 354–55 (6th Cir. 2001)).

Plaintiff contends that "[t]he ALJ's decision is void of any discussion of Listing 12.05 or

the school records that were submitted and reviewed by the State agency consultants." (Doc. 8 at

7). Plaintiff is referring to a one-sentence note in the state agency consultant's opinion that states

"MAYSVILLE LOCAL: MER dated 5/12/2000 Wechsler Intelligence. FSIQ 73." (Tr. 104,

PAGEID #: 145). Plaintiff avers that "[i]t is not clear why these records were not exhibited as

part of the record," but "[t]his score combined with the evidence of the record indicates that Ms.

Maxwell has deficits in adaptive functioning initially manifested during the developmental [sic]

before age 22 and meets the first prong of Listing 12.05C." (Doc. 8 at 7).

In support, Plaintiff argues that Dr. Sours's examination and Ms. Lutz's treatment notes support that Plaintiff maintained deficits in adaptive functioning, as does the fact that Plaintiff had documented learning disabilities and a history of special education classes. (*Id.* at 8 (citing PAGEID #: 591, 641)). Plaintiff fails to acknowledge, however, that the regulations require deficits in adaptive functioning to manifest *during* the "developmental period." *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 540 (6th Cir. 2014) (holding that Plaintiff "*must* put on evidence indicating that he had adaptive functioning deficits during his developmental period") (emphasis added). That there are opinions in the record that document deficits in adaptive functioning is not enough; there must be record evidence to support the onset of the impairment before age twenty-two. *Id.* ("[N]either circumstantial evidence such as school records nor a history of special education combined with an adult IQ score are necessarily enough to demonstrate that a claimant had adaptive functioning deficits before age twenty-two[.]"); *Eddy v. Comm'r of Soc. Sec.*, 506 F. App'x 508, 510 (6th Cir. 2012) (holding that a claimant's eighth grade education with a history of special education classes did not establish deficits in adaptive functioning prior to age twenty-two); *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 676–77 (6th Cir. 2009) ("This Court has never held that poor academic performance, in and of itself, is sufficient to warrant a finding of onset of subaverage intellectual functioning before age twenty-two."). Here, no such evidence is present in the record.

Plaintiff concedes that "information about [her] ability to adapt before age 22 is limited," but states that these additional records should have been exhibited and made part of the record. (Doc. 8 at 9). In other words, Plaintiff argues "the ALJ did not meet his duty to explore all of the relevant facts because he failed to discuss any school records or explain why this evidence was not made part of the record." (*Id.* at 9–10). The regulations provide:

> [i]n general, you have to prove to us that you are . . . disabled. Therefore, you
> must bring to our attention everything that shows that you are . . . disabled. This
> means that you must furnish medical and other evidence that we can use to reach
> conclusions about your medical impairment(s) and, if material to the
> determination of whether you are . . . disabled, its effect on your ability to work
> on a sustained basis. We will consider only impairment(s) you say you have or
> about which we receive evidence.

20 C.F.R. § 404.1512(a). Put another way, "[t]he claimant bears the ultimate burden to prove by

sufficient evidence that she is entitled to benefits." *Trandafir v. Comm'r of Soc. Sec.*, 58 F.

App'x 113, 115 (6th Cir. 2003) (citing *id.*).

Here, the ALJ expressly asked Plaintiff's counsel at both hearings whether the record was

complete, to which counsel answered in the affirmative. (Tr. 39, 47, PAGEID #: 79, 87).

Further, only under "special circumstances, i.e., when a claimant is without counsel, is not

capable of presenting an effective case, and is unfamiliar with hearing procedures, does an ALJ

have a special, heightened duty to develop the record." *Trandafir*, 58 F. App'x at 115 (citations

omitted). Those circumstances are not present in this case. Any argument that the record was

incomplete or the ALJ should have done more to develop the record is thus unavailing. Further,

the IQ score at issue was a 73, not the required 60 through 70. *See Mischka v. Colvin*, No. 13-

CV-1881, 2014 WL 7913045, at *18 (N.D. Ohio Sept. 29, 2014), *adopted in part*, No. 1:13-CV-

1881, 2015 WL 778869 (N.D. Ohio Feb. 24, 2015) (holding Plaintiff did not meet the

requirements of 12.05(C), in part because the testing "revealed a full scale IQ of 73, which is

greater than the IQ limit set forth in Listing 12.05(C)").

Without establishing the first or second prong, Plaintiff cannot equal listing 12.05. *See*

*Peterson*, 552 F. App'x at 539 ("An impairment that satisfies only some of the relevant listing

criteria does not qualify, regardless of its severity."). The undersigned thus finds no error

because even if the school records were part of the record, Plaintiff is not able to meet Listing 12.05(C).

### B. RFC Determination

Plaintiff next argues that substantial evidence does not support the ALJ's RFC because it does not adequately account for Plaintiff's mental impairments. (Doc. 8 at 11). More specifically, Plaintiff contends that the ALJ "neglected to incorporate all of the relevant limitations" described by the state agency consultants and Dr. Sours, and did not "explain why the limitations were omitted." (*Id.* at 10).

As an initial matter, even when an ALJ assigns great weight to a medical opinion, he is "not required to incorporate the entirety of [that] opinion" into an RFC. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). For it is the ALJ, not a physician, who ultimately determines a claimant's RFC. 42 U.S.C. § 423(d)(5)(B); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC."). Indeed, "[a]n RFC determination is a legal decision rather than a medical one, and the development of a claimant's RFC is solely within the province of an ALJ." 20 C.F.R. §§ 404.1527(e), 405.1546.

Here, despite Plaintiff's assertions, the RFC incorporates, and is consistent with, the opinions of the state agency consultants and Dr. Sours. For example, Dr. Sours found Plaintiff was limited—although no explanation was given for how limited—in her ability to understand, remember, and carry out instructions; attend and concentrate; and maintain appropriate behaviors in a work setting. (Tr. 546–47, PAGEID #: 591–92). Similarly, the state agency psychologists opined that Plaintiff had marked limitations in her ability to maintain social functioning and moderate limitations in her ability to perform activities of daily living and her ability to maintain

concentration, persistence, or pace.  (Tr. 90–91, 125–27, PAGEID #: 132–33, 166–68).  In his opinion, the ALJ made the exact same findings.  (*See* Tr. 21, PAGEID #: 61).

The state agency psychologists also found that Plaintiff would do best in a work setting with simple and repetitive duties, brief interaction with others, no interactions with the public, and no strict production quotas.  (Tr. 90–92, PAGEID #: 131–33).  The ALJ's RFC limited Plaintiff to simple, routine, repetitive tasks; occasional interaction with co-workers and supervisors; and no interaction with the public.  (Tr. 23, PAGEID #: 63).  Plaintiff argues though that "[t]he ALJ failed to explain how occasional interaction was the same as 'brief' interaction or how the residual functional capacity accounted for [Plaintiff's] inability to handle large crowds," or her marked limitations in social functioning.  (Doc. 8 at 12).  Upon review, however, the undersigned finds that the ALJ adequately accounted for these limitations and the RFC was supported by substantial evidence in the record.  *See Reeves*, 618 F. App'x at 275 (holding that the ALJ's assessment of occasional interaction with the public was not inconsistent with the state psychologist's assessment that the claimant could "relate to few familiar others on a superficial basis").

Plaintiff also argues that the RFC does not address Plaintiff's problems with persistence, concentration, and potential time off task:

> The ALJ provided that Ms. Maxwell "can perform goal-based production where the work is measured by end result, not pace work.  She can perform simple, routine, repetitive tasks where she can be off task up to five percent of the workday.  She is limited to low stress jobs defined as jobs requiring only occasional changes in the work setting."  PageId No. 63.  While close, these limitations are not sufficient, and do not fully convey Ms. Maxell's limitations in concentration to the vocational expert.  Ms. Maxwell may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job.  The current hypothetical question is not adequate on the issue of moderate limitations of concentration, persistence and pace for this Court to have any idea as to the number of jobs identified by the vocational expert that would be excluded if quotas or other aspects related to moderate concentration limitations

were added to the hypothetical question.

(Doc. 8 at 13–14). In order for a VE's testimony to serve as substantial evidence in support of the conclusion that a plaintiff can perform other work, the hypothetical question posed by the ALJ must accurately portray all physical and mental impairments. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d at 239, 241 (6th Cir. 2002).

Plaintiff's disagreement, however, is with how the ALJ incorporated "moderate limitations in concentration, persistence, and pace" into his RFC. Plaintiff acknowledges though that "there is not bright-line rule as to how an ALJ should incorporate moderate concentration, persistence and pace limitations into his hypothetical questions to the vocational expert and, ultimately, the RFC[.]" (Doc. 8 at 14). Again, the opined limitations, while maybe not exactly what Plaintiff would have chosen, are supported by substantial evidence.

At base, the ALJ was charged with assessing Plaintiff's RFC "'based on all of the relevant medical and other evidence' of record." *Reeves*, 618 F. App'x at 275–76 (quoting 20 C.F.R. § 416.945(a)(3)). Even where an ALJ provides "great weight" to an opinion, there is no requirement that an ALJ adopt that opinion verbatim; nor is the ALJ required to adopt the opined limitations wholesale. *Id.* (citing *Harris v. Comm'r of Soc. Sec. Admin.*, No. 1:13–CV–00260, 2014 WL 346287, at *11 (N.D. Ohio Jan. 30, 2014)). Here, while the ALJ may not have adopted every possible limitation opined by the state agency consultants and Dr. Sours, the ALJ's mental RFC determination was supported by substantial evidence and is not inconsistent with the medical opinions in the record. *See id.*

### C. Plaintiff's Mental Health Therapist

In her final assignment of error, Plaintiff avers that the ALJ did not properly evaluate Ms. Lutz's opinion. (Doc. 8 at 14–17). Plaintiff argues "the ALJ erroneously held the opinion of

Ms. Lutz [was] entitled to 'little weight,' stating that the opinions [were] 'not consistent with her treatment records.'" (*Id.* at 15). According to Plaintiff, the ALJ failed to provide any analysis or insight into how he reached this conclusion, and cherry-picked statements to support his decision that were not representative of the record. (*Id.*).

As a social worker, Ms. Lutz is not an "acceptable medical source" pursuant to Social Security Ruling SSR 06-03P; instead she is an "other source." *See* SSR 06-03P (S.S.A.), 2006 SSR LEXIS 4, 2006 WL 2329939, at *2.[2] "Other sources" cannot establish the existence of a medically determinable impairment but "may provide insight into the severity of the impairment and how it affects the individual's ability to function." *Id.* The ruling notes that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as . . . licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions handled primarily by physicians and psychologists." *Id.* at *3. Such opinions are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file." *Id.* Accordingly, the ruling explains that opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, how well the source explains the opinion, and any other factors that tend to support or refute the opinion. *Id.* at *4–5. Finally, the ruling states that:

> [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these

---

[2] This regulation has been rescinded. It still applies, however, to claims (like this one) filed before March 27, 2017. 20 CFR § 404.1527.

"other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03P, 2006 WL 2329939 at *6.

Here, the ALJ considered and ultimately rejected Ms. Lutz's opinion for record-based reasons. First, the ALJ found that Ms. Lutz's extreme limitations were not consistent with her own treatment records, in which she regularly noted that Plaintiff was cooperative, pleasant, and exhibited logical thoughts and smiling behavior. (Tr. 26, PAGEID #: 66). The ALJ's consideration of these inconsistencies was proper. *See, e.g.*, *McCaleb v. Comm'r of Soc. Sec.*, No. 1:16-CV-466, 2017 WL 382339, at *5 (W.D. Mich. Jan. 27, 2017) (holding that the ALJ reasonably assigned little weight to a licensed clinical social worker after the ALJ found her treatment "notes to be inconsistent with the severity of the opinion"). The ALJ also considered that Ms. Lutz's notes observed that Plaintiff was "laughing and joking per usual," was "calm," and exhibited a "very positive outlook." (Tr. 26, PAGEID #: 66). Again, these types of descriptions are inconsistent with an individual as limited as Ms. Lutz ultimately opined, and provided sufficient reasoning for the ALJ to discredit her opinion. *See* 20 C.F.R. § 404.1527(c)(4) ("[T]he more consistent a medical opinion is with the record as a whole, the more weight we will give to that opinion."). Further, the fact that Ms. Lutz is not an acceptable source is also a relevant factor for giving the opinion little weight. *See McCaleb*, 2017 WL 382339, at *5.

In sum, the ALJ provided explicit and valid reasons, consistent with the regulatory factors, for not crediting Ms. Lutz's opinion. Although Plaintiff may disagree with the ALJ's final assessment of Ms. Lutz's opinion, Plaintiff has not shown that it was outside the ALJ's

permissible "zone of choice" that grants ALJs discretion to make findings without "interference by the courts." *Blakley*, 581 F.3d at 406.

## IV.    CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 8) be **OVERRULED** and that judgment be entered in favor of Defendant.

## <u>Procedure on Objections</u>

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date:   May 11, 2018                                  /s/ Kimberly A. Jolson
                                                      KIMBERLY A. JOLSON
                                                      UNITED STATES MAGISTRATE JUDGE